**No. 13-1374**

_____

IN THE
United States Court of Appeals for the Tenth Circuit
_____

UNITED STATES POSTAL SERVICE, *et al.*

Appellant,

v.

TAB BONIDY, AND NATIONAL ASSSOCIATION FOR GUN RIGHTS

Appellees.

_____

**BRIEF OF *AMICUS CURIAE* BRADY CENTER TO PREVENT
GUN VIOLENCE IN SUPPORT OF APPELLANTS**
_____

Jonathan L. Diesenhaus
S. Chartey Quarcoo
Kathryn L. Marshall
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004

Jonathan E. Lowy
Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye Street, N.W., Suite 1100
Washington, DC  20005

November 26, 2013                    Counsel for *Amicus Curiae*

# RULE 26.1 CERTIFICATION

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the

Brady Center To Prevent Gun Violence states that it has no parent corporation, nor

has it issued shares or debt securities to the public.  The Brady Center to Prevent

Gun Violence is a § 501(c)(3) non-profit corporation, and no publicly held

corporation holds ten percent of its stock.

s/ Jonathan L. Diesenhaus

## CONSENT TO FILE

Pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure, *amicus* received consent from all parties to file this brief. No party's counsel authored this brief in whole or in part. No party, party's counsel, or person other than *amicus*, its members, or its counsel, contributed money intended to fund preparation and submission of this brief.

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICUS* ..........................................................................1

INTRODUCTION ....................................................................................1

ARGUMENT ..........................................................................................3

I.      THE USPS REGULATION DOES NOT IMPLICATE
PROTECTED ACTIVITY ..............................................................3

         A.      *Heller* and *McDonald* Recognized A Narrow Right Of
Responsible, Law-Abiding Citizens To Possess A Gun In
The Home ..........................................................................3

         B.      Courts Post-*Heller* Have Agreed That The Second
Amendment Does Not Extend Beyond The Home To
Protect Public Gun Carrying ................................................5

         C.      The Right Recognized in *Heller* Is Subject To Historical
Restrictions And Prohibitions On Public Carrying Of
Firearms ..........................................................................8

II.      EVEN IF THE USPS REGULATION DID IMPLICATE
PROTECTED SECOND AMENDMENT ACTIVITY, IT
WOULD WITHSTAND APPROPRIATE SCRUTINY ....................13

         A.      The USPS Has A Substantial Interest In Regulating The
Use Of Its Property ............................................................14

         B.      The USPS Has A Substantial Interest In Protecting
Public Safety ....................................................................16

CONCLUSION ......................................................................................21

CERTIFICATE OF COMPLIANCE ..........................................................23

CERTIFICATE OF DIGITAL SUBMISSION ..............................................24

CERTIFICATE OF SERVICE ..................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adderley v. Florida*,
    385 U.S. 39 (1966)...............................................................14, 15

*Andrews v. State*,
    50 Tenn. 165 (1871) ..............................................................11

*Aymette v. State*,
    21 Tenn. 154 (1840) ..............................................................11

*Commonwealth v. Robinson*,
    600 A.2d 957 (Pa. Super. Ct. 1991) ...................................20

*Commonwealth v. Romero*,
    673 A.2d 374 (Pa. Super. Ct. 1996) ...................................20

*Courtemanche v. Gen Servs. Admin.*,
    172 F. Supp. 2d 251 (D. Mass 2001) ..................................16

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ...................................................... *passim*

*Drake v. Filko*,
    724 F.3d 426 (3d Cir. 2013) ...............................................2, 5

*Embody v. Cooper*,
    2013 WL 2295671 (Tenn. Ct. App. May 22, 2013) ...........8

*English v. State*,
    35 Tex. 473 (1871) ..............................................................9, 10

*Fife v. State*,
    31 Ark. 455 (1876) ...............................................................11

*Greer v. Spock*,
    96 S. Ct. 1211 (1976)...........................................................14

ii

*Heller v. District of Columbia,*
  698 F. Supp. 2d 179 (D.D.C. 2010) ....................................................................3

*Hill v. State*,
  53 Ga. 472 (1874) .............................................................................................11

*Kachalsky v. Cacace*,
  817 F. Supp. 2d 235 (S.D.N.Y. 2011) .................................................................7

*Kachalsky v. Cnty. of Westchester*,
  133 S. Ct. 1806 (2013)........................................................................................7

*Kachalsky v. Cnty. of Westchester*,
  701 F.3d 81 (2d Cir. 2012) ......................................................................6, 7, 16

*Knolls Action Project v. Knolls Atomic Power Lab.*,
  771 F.2d 46 (2d Cir. 1985) ...............................................................................14

*McDonald v. City of Chicago*,
  130 S. Ct. 3020 (2010).............................................................................. *passim*

*Moore v. Madigan*,
  702 F.3d 933 (7th Cir. 2012) .............................................................................7

*Nichols v. Brown*,
  CV 11-09916 SJO SS, 2013 WL 3368922 (C.D. Cal. July 3, 2013) ...............16

*Peterson v. Martinez*,
  707 F.3d 1197 (10th Cir. 2013)...................................................................1, 3, 5

*Piszcatoski v. Filko*,
  840 F. Supp. 2d 813 (D.N.J. 2012) ....................................................................2

*Richards v. County of Yolo*,
  821 F. Supp. 2d 1169 (E.D. Cal. 2011) ..............................................................7

*Robertson v. Baldwin*,
  165 U.S. 275 (1897) ............................................................................................8

*State v. Buzzard*,
  4 Ark. 18 (1842) ...............................................................................................11

*State v. Jumel*,
13 La. Ann. 399 (1858) ...................................................................................11

*State v. Knight*,
218 P.3d 1177 (Kan. Ct. App. 2009)................................................................8

*State v. Workman*,
35 W. Va. 367 (1891) ....................................................................................11

*Thompson v. Ashe*,
250 F.3d 399 (6th Cir. 2001) .........................................................................16

*United States v. Barton*,
633 F.3d 168 (3d Cir. 2011) ............................................................................5

*United States v. Bjerke*,
796 F.2d 643 (3d Cir. 1986) ..........................................................................14

*United States v. Chester*,
628 F.3d 673 (4th Cir. 2010)............................................................................3

*United States v. Dorosan*,
350 F. App'x 874 (5th Cir. 2009) ...................................................................15

*United States v. Hairston*,
64 F.3d 491 (9th Cir. 1995).............................................................................16

*United States v. Marzzarella*,
614 F.3d 85 (3d Cir. 2010) ...............................................................................3

*United States v. Masciandaro*,
638 F.3d 458 (4th Cir. 2011) ....................................................................3, 6, 7

*United States v. Masciandaro*,
648 F. Supp. 2d 779 (E.D. Va. 2009)............................................................3, 7

*United States v. Masciandaro*,
132 S. Ct. 756 (2011).......................................................................................6

*United States v. McCane*,
573 F.3d 1037 (10th Cir. 2009).......................................................................2

*United States v. Reese*,
   627 F.3d 792 (10th Cir. 2010) ..........................................................2, 3

*United States v. Salerno*,
   481 U.S. 739 (1987) ..............................................................................16

*United States v. Skoien*,
   614 F.3d 638 (7th Cir. 2010) ..................................................................3

*United States v. Tooley*,
   717 F. Supp. 2d 580 (S.D.W. Va. 2010) ................................................7

*United States v. Walker*,
   380 A.2d 1388 (D.C. 1977) ...................................................................17

*Williams v. State*,
   132 S. Ct. 93 (2011) ................................................................................8

*Williams v. State*,
   10 A.3d 1167 (Md. 2011) ........................................................................8

*Woollard v. Gallagher*,
   712 F.3d 865 (4th Cir. 2013) ..................................................................6

## STATUTES

18 U.S.C. § 930 ...........................................................................................15

1876 Wyo. Comp. Laws Chapter 52, § 1 (1876) ......................................10

Ark. Act of Apr. 1, 1881 ............................................................................11

D.C. Code § 22-4504 ...................................................................................4

Dodge City, Kan., Ordinance No. 16, § XI (Sept. 22, 1876) ...................10

Tex. Act of Apr. 12, 1871 ..........................................................................11

## REGULATIONS

39 C.F.R. § 232.1(*1*) ...........................................................................2, 21

## OTHER AUTHORITIES

Charles C. Branas *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, 99 AMER. J. PUB. HEALTH 2034 (Nov. 2009) .................18, 19

Darrell A.H. Miller, *Guns As Smut: Defending the Home-Bound Second Amendment*, 109 Colum. L. Rev. 1278 (2009)..............................................12, 13

David Hemenway & Deborah Azrael, *The Relative Frequency of Offensive and Defensive Gun Uses: Results From a National Survey*, 15 VIOLENCE & VICTIMS 257 (2000) ........................................................................18

David Hemenway, *Road Rage in Arizona: Armed and Dangerous*, 34 ACCIDENT ANALYSIS AND PREVENTION 807 (2002) ...........................................19

David McDowall *et al.*, *Easing Concealed Firearms Laws*, 86 J. CRIM. L. & CRIMINOLOGY 193 (1995) ......................................................................18

Hon. John Dillon, *The Right to Keep and Bear Arms for Public and Private Defense (Part 3),* 1 CENT. L. J. 259 (1874) ........................................................13

John Donohue, *Guns, Crime, and the Impact of State Right-To-Carry Laws*, 73 FORDHAM L. REV. 623 (2004)........................................................................18

John Norton Pomeroy, *An Introduction to the Constitutional Law of the United States* (1868) ...........................................................................12

Lisa M. Hepburn & David Hemenway, *Firearm Availability and Homicide: A Review of the Literature*, 9 AGGRESSION & VIOLENT BEHAV. 417 (2004)....................................................................................................17

Mark Duggan, *More Guns, More Crime*, 109 J. POL'Y. ECON. 1086 (2001) ..........18

Matthew Miller *et al.*, *Firearm Availability and Unintentional Firearm Deaths*, 33 ACCIDENT ANALYSIS & PREVENTION 477 (Jul. 2000) ......................18

Matthew Miller *et al.*, *Rates of Household Firearm Ownership and Homicide Across US Regions and States*, *1988–1997*, 92 AM. J. PUB. HEALTH 1988 (Dec. 2002) .................................................................17

Matthew Miller *et al.*, *State-Level Homicide Victimization Rates in the US in Relation to Survey Measures of Household Firearm Ownership, 2001-2003*, 64 SOC. SCI. & MED. 656 (Feb. 2007) ......................................................17

Patrick J. Charles, *Scribble Scrabble, the Second Amendment, and Historical Guideposts: A Short Reply to Lawrence Rosenthal and Joyce Lee Malcolm*, 105 NW. U. L. REV. COLLOQUY 225 (2011) ...............................13

Patrick J. Charles, *The Faces of the Second Amendment Outside the Home*, 60 CLEVELAND ST. L. REV. 1 (2012) ..................................................................12

Philip Cook *et al.*, *Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. REV. 1041 (2009)..............................19

Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, 90 J. PUB. ECON. 379 (2006)...................................................................................................19

Possession of Firearms on Publicly Owned Property, Tenn. Opp. Att'y Gen. No. 04-020 (Feb. 9, 2004) ...............................................................................15

San Mateo County Sheriff's Office, "Unloaded Open Carry" (Jan. 14, 2010).......21

William Blackstone, *Commentaries on the Laws of England* (1765-1769) ...........12

## INTEREST OF *AMICUS*

*Amicus* the Brady Center to Prevent Gun Violence is the nation's largest non-partisan, non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy.  Through its Legal Action Project, the Brady Center has filed numerous briefs *amicus curiae* in cases involving state and federal gun laws, including *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010).  *Amicus* brings a broad and deep perspective to the issues raised by this case and has a compelling interest in ensuring that the Second Amendment does not impede reasonable governmental action to prevent gun violence.

## INTRODUCTION

The right to keep and bear arms recognized in *District of Columbia v. Heller* is unique among constitutional rights in the risks it presents.  554 U.S. 570 (2008).  Guns are designed to kill, and gun possession and use subject others to a serious risk of deadly harm.  While the Supreme Court in *Heller* held that the Second Amendment protects a limited right of law-abiding, responsible people to possess a gun *in the home* for self-defense, it has never recognized a far broader right to carry guns in public.  This Circuit, too, has repeatedly declined to extend the limited right announced in *Heller* beyond the home.  *See Peterson v. Martinez*,

707 F.3d 1197 (10th Cir. 2013); *United States v. Reese*, 627 F.3d 792, 800 (10th Cir. 2010); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009).

That restraint is well-founded.  As state and federal jurists have noted, courts should be "careful – most careful – to ascertain the reach of" the right to carry "because it permits the user of a firearm to cause serious personal injury – including the ultimate injury, death – to other individuals."  *Piszcatoski v. Filko*, 840 F. Supp. 2d 813, 816 (D.N.J. 2012), *aff'd sub nom. Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013).  Neither *Heller* nor the historical record undermines the longstanding authority of the government to restrict public carrying of guns.  To the contrary, such restrictions on public carrying have deep roots in English and early American law, and have long been recognized *not* to implicate the right to bear arms.  *Heller* stands squarely in that unbroken line of history.  The district court's opinion, by contrast, is a marked departure from precedent and is inconsistent with the "assurances" of *Heller* and *McDonald* that "reasonable firearms regulations" remain permissible.  It also is incorrect.

Application of 39 C.F.R. § 232.1(*l*) ("USPS Regulation") to prohibit the carrying of firearms in the parking lot of the Avon Post Office does not infringe Appellees' rights to possess a gun for self-defense in the home.  Thus, it does not

implicate Second Amendment protections, and it is constitutional.[1]  *See United States v. Masciandaro*, 648 F. Supp. 2d 779, 788-90 (E.D. Va. 2009) *aff'd*, 638 F.3d 458 (4th Cir. 2011).   At least 40 courts—federal and state, trial and appellate—have either concluded that the Second Amendment does not extend beyond the home or have upheld restrictions or prohibitions on public carrying. *See, e.g.*, *infra* II.B.  This Court should not find otherwise. The judgment of the district court should be reversed.

## ARGUMENT

## I.  THE USPS REGULATION DOES NOT IMPLICATE PROTECTED ACTIVITY

### A. *Heller* and *McDonald* Recognized A Narrow Right Of Responsible, Law-Abiding Citizens To Possess A Gun In The Home

The Supreme Court's decision in *Heller* recognized that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms *in*

---

[1]     In the wake of *Heller* and its progeny, this Circuit, and others, have utilized a two-pronged approach to Second Amendment claims.  *See, e.g., Peterson*, 707 F.3d at 1208; *Reese*, 627 F.3d at 800-01; *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010); *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010); *Heller v. District of Columbia* ("*Heller II*"), 698 F. Supp. 2d 179, 188 (D.D.C. 2010).   Under this approach, courts ask:  (1) does the law or regulation at issue implicate protected Second Amendment activity, and (2) if so, does it withstand the appropriate level of scrutiny?  *See Reese*, 627 F.3d at 800-01.  If the challenged law or regulation does not implicate protected Second Amendment activity, then the analysis ends and the law is deemed constitutional.  That is the case here.

*defense of hearth and home.*" *Heller*, 554 U.S. at 635 (emphasis added). The Court recognized only the petitioner's right "to carry [ ] in the home," *id.*, and did not endorse the public carrying of firearms, *see id.* It focused on the historical recognition of the right of individuals "to keep and bear arms to defend their homes, families or themselves," *id.* at 615 (internal quotation marks omitted), and the continuing need to keep and use firearms "in defense of hearth and home," *id.* at 635. Thus it held only that "the District's ban on handgun possession *in the home* violates the Second Amendment, as does its prohibition against rendering any lawful firearm *in the home* operable for the purpose of immediate self-defense." *Id.* at 635 (emphasis added).

Notably, the *Heller* Court, though expounding upon a wide range of gun laws beyond those directly at issue, and aware that District law barred (and still bars) Mr. Heller from carrying guns in public, openly or concealed, repeatedly and explicitly stated that it was only granting him a right to "carry [] in the home." *Heller*, 554 U.S. at 635; D.C. Code § 22-4504. Additionally, the Court—despite dedicating Part III of its opinion to discussing numerous gun laws not at issue, and holding both that the Second Amendment was "not unlimited" and that a (non-exhaustive) host of gun laws remained "presumptively lawful"—never even suggested that Mr. Heller was being deprived of a right to carry guns anywhere beyond his home. The *Heller* Court also expressly approved of decisions

upholding concealed carry bans, but chose not to state the inverse point that is crucial to Appellees' argument here and in the District Court: that that the Second Amendment also affords some form of protection to carrying firearms in public..

In *McDonald*, the Court incorporated the Second Amendment to the 50 states, but "repeat[ed]" *Heller*'s "assurances" regarding its limited scope, and agreed that "state and local experimentation with reasonable firearms regulations will continue under the Second Amendment." *McDonald*, 130 S. Ct. at 3046-47 (internal citation omitted). Once again, the Court took care not to extend the Second Amendment right beyond the home.

## B. Courts Post-*Heller* Have Agreed That The Second Amendment Does Not Extend Beyond The Home To Protect Public Gun Carrying

The district court below stands starkly in contrast to the overwhelming majority of its sister courts, which have declined, post-*Heller*, to find that the Second Amendment protects a broad right to carry weapons in public. This Circuit stands firm in this assessment. *See, e.g.*, *Peterson*, 707 F.3d at 1210-12.

Other federal appellate courts have exercised equal – and appropriate – caution. For example, the Third Circuit has taken care not to extend the limited right announced in *Heller* beyond the home. *See Drake v. Filko*, 724 F.3d 426, 431 (3d Cir. 2013) (declining to "declare that the individual right to bear arms for the purpose of self-defense extends beyond the home"); *United States v. Barton*,

633 F.3d 168, 170-71 (3d Cir. 2011) ("At the core of the Second Amendment is

the right of law-abiding, responsible citizens to use arms in defense of *hearth and*

*home.*").    The Fourth Circuit similarly has declined to recognize a Second

Amendment right that extends beyond the home, refusing to "push *Heller* past its

undisputed core holding." *United States v. Masciandaro*, 638 F.3d 458, 475 (4th

Cir. 2011), *cert. denied*, 132 S. Ct. 756 (2011).  As the court reasoned:

> This is serious business.  We do not wish to be even minutely
> responsible for some unspeakably tragic act of mayhem because in
> the peace of our judicial chambers we miscalculated as to Second
> Amendment rights.  It is not far-fetched to think the *Heller* Court
> wished to leave open the possibility that such a danger would rise
> exponentially as one moved the right from the home to the public
> square.

*Id.* at 475-76.  *See also Woollard v. Gallagher*, 712 F.3d 865, 874 (4th Cir. 2013)

("*Heller,* however, was principally concerned with the 'core protection' of the

Second Amendment: 'the right of law-abiding, responsible citizens to use arms in

defense of hearth and home.'").  The Second Circuit also has taken this approach.

*See Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 100 (2d Cir. 2012)

("[L]imiting handgun possession to persons who have an articulable basis for

believing they will need the weapon for self-defense is in the best interest of

public safety and outweighs the need to have a handgun for an unexpected

confrontation" and thus is consistent with the Second Amendment).[2]

The vast majority of federal district courts have taken a similar approach, holding that "the Court, both in *Heller*, and subsequently in *McDonald*, took painstaking effort to clearly enumerate that the scope of *Heller* extends only to the right to keep a firearm *in the home* for self-defense purposes." *Richards v. County of Yolo*, 821 F. Supp. 2d 1169, 1174 & n.4 (E.D. Cal. 2011). *See also, e.g.*; *Kachalsky v. Cacace*, 817 F. Supp. 2d 235, 264 (S.D.N.Y. 2011) *aff'd sub nom. Kachalsky v. Cnty. of Westchester*, 701 F.3d 81 (2d Cir. 2012) *cert. denied*, 133 S. Ct. 1806 (2013) ("To the extent that Plaintiffs are attacking New York's statutory scheme as precluding open carry . . .such carrying is likewise outside the core Second Amendment concern articulated in *Heller*"); *United States v. Tooley*, 717 F. Supp. 2d 580, 596 (S.D.W. Va. 2010) ("Additionally, possession of a firearm outside of the home or for purposes other than self-defense in the home are not within the 'core' of the Second Amendment right as defined by *Heller*."); *United States v. Masciandaro*, 648 F. Supp. 2d 779, 788-90 (E.D. Va. 2009) *aff'd*, 638 F.3d 458 (4th Cir. 2011) ("[I]t is clear that § 2.4(b) does not have the purpose or effect of placing a substantial obstacle in the path of Masciandaro's exercise of his

---

[2]    *Moore v. Madigan*, 702 F.3d 933 (7th Cir. Dec. 11, 2012), disregards the fact that *Heller* carefully limited its holding to the home. Instead, the two-judge majority there relied on a three-sentence syllogism to conclude that, because "[t]o speak of 'bearing' arms within one's home" would have been "awkward," a "right to bear arms thus implies a right to carry a loaded gun outside the home." *Id.* at

Second Amendment right, as announced in *Heller,* 'to use arms in defense of hearth and home.'  Accordingly, [it] plainly withstands any elevated level of scrutiny") (citations omitted).[3]

The district court's opinion here is irreconcilable with the views of this broad array of courts across the country after *Heller*.

### C. The Right Recognized In *Heller* Is Subject To Historical Restrictions And Prohibitions On Public Carrying Of Firearms

A finding that the USPS Regulation does not implicate protected activity also would be fully consistent with the historical record of enumerated rights protected by the Second Amendment. The Supreme Court has stated that the Second Amendment codified a preexisting right, "inherited from our English ancestors . . . subject to certain well-recognized exceptions . . . which continue to be recognized as if they had been formally expressed."  *Robertson*, 165 U.S. at

---

936.

[3]  Many state appellate courts have similarly concluded that the right announced in *Heller* is confined to the home.  *See, e.g.*, *Embody v. Cooper*, 2013 WL 2295671, *7-*8 (Tenn. Ct. App. May 22, 2013) ("We believe this right of 'citizens to use arms in defense of hearth and home' to be the core Second Amendment right under *Heller* and *McDonald*.  [The challenged statute] is not a prohibition on the possession on firearms in the home" and therefore "is within the constitutionally permissible realm of firearm regulations available to the state, and it violates neither the state nor federal constitution."); *Williams v. State*, 10 A.3d 1167, 1176-77 (Md. 2011), *cert. denied*, 132 S. Ct. 93 (2011) ("*Heller* and *McDonald* emphasize that the Second Amendment is applicable to statutory prohibitions against home possession" and *McDonald* "reiterated that regulatory schemes . . . prohibiting wearing, carrying, or transporting handguns in various public places outside of the home, were permissible . . . ."); *State v. Knight*, 218 P.3d 1177, 1189 (Kan. Ct. App. 2009) ("It is clear that the [*Heller*] Court was drawing a narrow line regarding the violations related solely to use of a handgun in the home for self-defense purposes.").

281; *see also Heller*, 554 U.S. at 592-95, 600-03, 605-19, 626-28 (tracing the right to bear arms through Anglo-American origins and state analogues); *McDonald*, 130 S. Ct. at 3056 ("[T]raditional restrictions" on the Second Amendment "show the scope of the right," just as they do "for *other* rights.") (Scalia, J., concurring). The *Heller* Court stated specifically that its opinion was not "to cast doubt on longstanding prohibitions" in the history of Anglo-American jurisprudence. 554 U.S. at 626.

Among the "longstanding prohibitions" cited in *Heller* was the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" a limitation construed to allow for prohibitions on the public carrying of handguns. *Heller*, 554 U.S. at 627. *Heller* cited as authority for this "historical tradition" the 19th-century case of *English v. State*, 35 Tex. 473 (1871) (cited in *Heller*, 554 U.S. at 627), in which the Texas Supreme Court upheld a conviction for carrying a pistol in public under a statute banning the public carry of deadly weapons, including handguns. In reaching that conclusion, the court traced the history of analogous statutes, noting that Blackstone had characterized "the offense of riding around or going around with dangerous or unusual weapons" as a crime. 35 Tex. at 476. *English* traced the roots of such statutes back further through "the statute of Northampton (2 Edward III, c.3)," the "early common law of England," and even to "the laws of Solon" in ancient Greece. *Id.* The *English* court rebuffed the

argument that the Second Amendment prohibited such laws, noting that it was "useless to talk about personal liberty being infringed by laws such as that under consideration." *Id.* at 477. As such, it was a "little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into a church . . . or any other place where ladies and gentlemen are congregated together." *Id.* at 478-79. The *English* court recognized that prohibiting the public carry of deadly weapons was important to prevent crime, and it quoted John Stewart Mill that "[i]t is one of the undisputed functions of government, to take precautions against crime before it has been committed, as well as to detect and punish afterwards," given "[t]he right inherent in society to ward off crimes against itself by antecedent precautions. . . ." 35 Tex. at 478.

*English* recognized that restrictions and prohibitions on public carrying were widespread: "It is safe to say that almost, if not every one of the states of this Union have a similar law upon their statute books, and, indeed, so far as we have been able to examine them, they are more rigorous than the act under consideration." *Id.* at 479. Indeed, even Wyatt Earp prohibited public gun carrying in Dodge City. *See* Dodge City, Kan., Ordinance No. 16, § XI (Sept. 22, 1876); *see also* 1876 Wyo. Comp. Laws ch. 52, § 1 (1876 Wyoming law prohibiting anyone from "bear[ing] upon his person, concealed or openly, any

firearm or other deadly weapon, within the limits of any city, town or village"); Ark. Act of Apr. 1, 1881; Tex. Act of Apr. 12, 1871; *Fife v. State*, 31 Ark. 455 (1876) (upholding carrying prohibition as a lawful "exercise of the police power of the State without any infringement of the constitutional right" to bear arms); *Hill v. State*, 53 Ga. 472, 474 (1874) ("at a loss to follow the line of thought that extends the guarantee"—the state constitutional "right of the people to keep and bear arms"—"to the right to carry pistols, dirks, Bowieknives, and those other weapons of like character, which, as all admit, are the greatest nuisances of our day"); *State v. Workman*, 35 W. Va. 367, 373 (1891); *Aymette v. State*, 21 Tenn. 154, 159-61 (1840) ("The Legislature, therefore, have a right to prohibit the wearing or keeping weapons dangerous to the peace and safety of the citizens, and which are not usual in civilized warfare, or would not contribute to the common defence."); *State v. Buzzard*, 4 Ark. 18, 21 (1842); *State v. Jumel*, 13 La. Ann. 399, 400 (1858).

Another authority cited by *Heller*, 554 U.S. at 608, 613, 629, *Andrews v. State*, 50 Tenn. 165, 188-89 (1871), similarly drew a sharp distinction between carrying firearms at home and in public, explaining that "no law can punish" a man "while he uses such arms at home or on his own property,"

> Yet, when he carries his property abroad, goes among the people in public assemblages where others are to be affected by his own conduct, then he brings himself within the pale of public regulation, and must submit to such restriction on the mode of using or carrying

his property as the people through their Legislature, shall see fit to impose for the general good.

Accordingly, the historic scope of the right to keep and bear arms properly includes the understanding that restricting public carry was not understood to implicate the right. *See* Patrick J. Charles, *The Faces of the Second Amendment Outside the Home*, 60 CLEVELAND ST. L. REV. 1, 8 (2012) (hereinafter Charles, *Outside the Home*) (quoting 2 Edw. 3, c.3 (1328) (Eng.)); Darrell A. H. Miller, *Guns As Smut: Defending the Home-Bound Second Amendment*, 109 COLUM. L. REV. 1278, 1318 n.246 (2009) (noting that Blackstone compared the Statute of Northampton to "the laws of Solon," under which "every Athenian was finable who walked about the city in armour") (quoting 2 William Blackstone, Commentaries *149).

Noted scholars and commentators have also long recognized that a right to keep and bear arms does not prevent states from restricting or forbidding guns in public places. For example, John Norton Pomeroy's Treatise, which *Heller* cited as representative of "post-Civil War 19th-century sources" commenting on the right to bear arms, 554 U.S. at 618, stated that the right to keep and bear arms "is certainly not violated by laws forbidding persons to carry dangerous or concealed weapons . . . ." John Norton Pomeroy, *An Introduction to the Constitutional Law of the United States,* 152-53 (1868). Similarly, Judge John Dillon explained that

even where there is a right to bear arms, "the peace of society and the safety of peaceable citizens plead loudly for protection against the evils which result from permitting other citizens to go armed with dangerous weapons."  Hon. John Dillon, *The Right to Keep and Bear Arms for Public and Private Defense (Part 3)*, 1 CENT. L. J. 259, 287 (1874).

Such "restrictions began appearing on the carrying or using of 'arms' as a means to prevent public injury" since "the Norman Conquest."  Patrick J. Charles, *Scribble Scrabble, the Second Amendment, and Historical Guideposts: A Short Reply to Lawrence Rosenthal and Joyce Lee Malcolm*, 105 NW. U. L. REV. COLLOQUY 225 (2011).  *See also* Darrell A. H. Miller, *supra* 16, at 1354 ("[S]tates and municipalities, far more sensitive to local needs and gun cultures, should be given free reign to design gun control policy that fits their specific demographic.").  To hold that the Constitution dictates that public carry must be permitted would carve into stone a rule that forecloses the adoption of arms regulations that have been recognized since antiquity as one of the ways in which government in a civil society protects the people and the public good.

## II. EVEN IF THE USPS REGULATION DID IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY, IT WOULD WITHSTAND APPROPRIATE SCRUTINY

To the extent the Court determines that the USPS Regulation implicates protected Second Amendment activity as applied to the carrying of guns in the

parking lot adjacent to the Avon Post Office Building, it still should be upheld.

### A. The USPS Has A Substantial Interest In Regulating The Use Of Its Property

Even if the district court were correct in finding that the parking lot is not a "sensitive place" deserving of a "presumption" that the USPS Regulation is valid, there can be no doubt that a parking lot bears no similarity to Appellees' homes and that the USPS has a substantial interest in protecting the safety of its customers, employees, and other guests on its property, which it maintains for the public good.  The government's constitutional authority to regulate the use of its property is well-established.  In *Adderley v. Florida*, the Supreme Court expressly proclaimed, "[t]he United States Constitution does not forbid a State to control the use of its own property for its own lawful nondiscriminatory purpose."  385 U.S. 39, 48 (1966).  Upholding the enforcement of state trespass laws, the Court articulated the state's authority, as landowner, to govern its grounds.  It recognized that "the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."  *Id.* at 47; *see also Greer v. Spock*, 96 S. Ct. 1211, 1217 (1976); *United States v. Bjerke*, 796 F.2d 643, 647 (3d Cir. 1986); *Knolls Action Project v. Knolls Atomic Power Lab.*, 771 F.2d 46, 50 (2d Cir. 1985).

Gun owners bear no special exemption from this authority; courts have long

applied similar reasoning to uphold restrictions on gun carrying on government property, and have continued to do so even after the Supreme Court handed down its decision in *Heller*.  In fact, the Fifth Circuit recently dismissed a challenge to the very USPS Regulation Appellees here contest.  *United States v. Dorosan*, 350 F. App'x 874, 875 (5th Cir. 2009).  As in *Adderley*,  the court based its decision on more than general principles of public safety, citing in addition the government's interest in regulating its property.  *Id.*  Thus, the court held that the USPS' permissible "restrictions on guns stemmed from its constitutional authority as property owner."  *Id.*

Recognition of government authority to regulate gun carrying on government property is hardly novel.  *Heller* highlighted it.  Federal statutes codify it.  *See* 18 U.S.C. § 930 (prohibiting gun carrying in work "building[s] or part[s] thereof owned or leased by the Federal government").  And state officials recognize it.  As a 2004 Tennessee Attorney General's opinion stated, for instance:

> [State law] authorizes local, state, or federal government entities to prohibit anyone, *even persons with a valid handgun carrying permit*, from carrying weapons otherwise authorized to be possessed . . . at meetings conducted by, or on property owned, operated, managed by the entity, or under its control.

Possession of Firearms on Publicly Owned Property, Tenn. Opp. Att'y Gen. No. 04-020 (Feb. 9, 2004) (emphasis added), *available at* http://www.tn.gov/attorneygeneral/op/2004/op/op20.pdf.

15

Furthermore, courts have repeatedly upheld the government's authority to regulate the use of its property in the interest of public safety. *See, e.g.*, *Thompson v. Ashe*, 250 F.3d. 399, 407 (6th Cir. 2001) (recognizing the constitutionality, "legitimate governmental purpose," and "goal" of policies aimed at "the suppression and prevention of crime in public housing"); *United States v. Hairston*, 64 F.3d 491, 496 (9th Cir. 1995) ("[T]he United States, like any other property owner, has an interest in protecting the safety of persons who enter upon its property."); *Courtemanche v. Gen. Servs. Admin.*, 172 F. Supp. 2d 251, 272 (D. Mass. 2001) (acknowledging the government's "significant interest" in ensuring public safety on federal and public property).Thus, even if the parking lot is not a "sensitive place," it is USPS property, and the USPS has a substantial interest in regulating it.  In fact, it has the constitutional right of a property owner to do so.

## B. The USPS Has A Substantial Interest In Protecting Public Safety

The USPS also "has [a] substantial, indeed compelling . . . interest[] in public safety and crime prevention." *Kachalsky*, 703 F.3d at 97.  Indeed, protecting the public from violent crime is the paradigmatic example of a compelling government interest. *See United States v. Salerno*, 481 U.S. 739, 749 (1987) (noting that "[t]he government's interest in preventing crime…is both legitimate and compelling"); *Nichols v. Brown*, CV 11-09916 SJO SS, 2013 WL 3368922, at *5-*6 (C.D. Cal. July 3, 2013) (holding that because "California has a

substantial interest in increasing public safety by restricting the open carry of firearms," the challenged laws "likely satisfy intermediate scrutiny," and thus denying plaintiff's motion for injunction); *United States v. Walker*, 380 A.2d 1388, 1390 (D.C. 1977) (noting "inherent risk of harm to the public of such dangerous instrumentality being carried about the community and away from the residence or business of the possessor"). That is the interest that the UPS Regulation serves. The carrying of firearms in public introduces risks not presented by firearm possession in the home and thus undoubtedly implicates significant and important governmental interests. Three aspects are worthy of special note.

First, carrying firearms outside the home threatens the safety of a broader range of individuals. Firearms kept in the home are primarily a threat to gun owners, and their family members, friends, and houseguests.[4]    But firearms

---

[4]    *See, e.g.,* Matthew Miller *et al.*, *State-Level Homicide Victimization Rates in the US in Relation to Survey Measures of Household Firearm Ownership, 2001-2003*, 64 SOC. SCI. & MED. 656 (Feb. 2007) ("States with higher rates of firearm ownership had significantly higher homicide victimization rates."); Lisa M. Hepburn & David Hemenway, *Firearm Availability and Homicide: A Review of the Literature*, 9 AGGRESSION & VIOLENT BEHAV. 417 (2004) ("[H]ouseholds with firearms are at higher risk for homicide, and there is no net beneficial effect of firearm ownership."); Matthew Miller *et al.*, *Rates of Household Firearm Ownership and Homicide Across US Regions and States*, *1988–1997*, 92 AM. J. PUB. HEALTH 1988, 1988 (Dec. 2002) ("[I]n areas where household firearm ownership rates were higher, a disproportionately large number of people died

carried in public present a threat to strangers, law enforcement offices, random passersby, and other citizens. Such guns expose all members of society to great risks, as guns are "used far more often to intimidate and threaten than they are used to thwart crimes." David Hemenway & Deborah Azrael, *The Relative Frequency of Offensive and Defensive Gun Uses: Results From a National Survey*, 15 VIOLENCE & VICTIMS 257, 271 (2000).

Second, carrying firearms in public is not an effective form of self-defense and, in fact, repeatedly has been shown to *increase* the chances that one will fall victim to violent crime. *See* Charles C. Branas, *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, 99 Am. J. Pub. Health 2034 (2009) [hereinafter "Investigating the Link"]. Analyses of the connection between increased gun prevalence and crime "indicate a rather substantial increase in robbery," John Donohue, *Guns, Crime, and the Impact of State Right-To-Carry Laws*, 73 FORDHAM L. REV. 623, 633 (2004), while "policies to *discourage* firearms in public may help prevent violence." McDowall *et al.*, *Easing Concealed Firearms Laws*, 86 J. CRIM. L. & CRIMINOLOGY at 203. Another study

---

from homicide."); Mark Duggan, *More Guns, More Crime*, 109 J. POL'Y. ECON. 1086 (2001); Matthew Miller *et al.*, *Firearm Availability and Unintentional Firearm Deaths*, 33 ACCIDENT ANALYSIS & PREVENTION 477 (Jul. 2000) ("A statistically significant and robust association exists between gun availability and unintentional firearm deaths.").

found that "gun possession by urban adults was associated with a significantly increased risk of being shot in an assault," and that "guns did not seem to protect those who possessed them from being shot in an assault." Branas, *Investigating the Link*,. Likewise, another study found that:

> Two-thirds of prisoners incarcerated for gun offenses reported that the chance of running into an armed victim was very or somewhat important in their own choice to use a gun. Currently, criminals use guns in only about 25 percent of noncommercial robberies and 5 percent of assaults. If increased gun carrying among potential victims causes criminals to carry guns more often themselves, or become quicker to use guns to avert armed self-defense, the end result could be that street crime becomes more lethal.

Philip Cook *et al.*, *Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. REV. 1041, 1081 (2009).

Third, the carrying of firearms in public negatively implicates other social issues and portends societal ills unlike firearms in the home. For one, if drivers carry loaded guns, road rage can become a more serious and potentially deadly phenomenon. David Hemenway, *Road Rage in Arizona: Armed and Dangerous*, 34 ACCIDENT ANALYSIS AND PREVENTION 807-14 (2002). Increases in gun prevalence in public may cause an intensification of criminal violence. Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, 90 J. PUB. ECON. 379, 387 (2006).

Further, law enforcement's ability to protect themselves and the public

could be greatly restricted if officers were required to presume that a person carrying a firearm in public was doing so lawfully. When the carrying of guns in public is restricted, "possession of a concealed firearm by an individual in public is sufficient to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach the individual and briefly detain him in order to investigate whether the person is properly licensed." *Commonwealth v. Robinson*, 600 A.2d 957, 959 (Pa. Super. Ct. 1991); *accord Commonwealth v. Romero*, 673 A.2d 374, 377 (Pa. Super. Ct. 1996). By contrast, under an expansive Second Amendment regime, an officer might not be deemed to have cause to arrest, search, or stop a person seen carrying a loaded gun, even though far less risky behavior could justify police intervention. Law enforcement should not have to wait for a gun to be fired before protecting the public.

In addition to hamstringing law enforcement, open carry also increases the risk of harm to the public in more immediate ways. A press release by the San Mateo County, California Sheriff's Office illustrates these risks:

> Open carry advocates create a potentially very dangerous situation. When police are called to a 'man with a gun' call they typically are responding to a situation about which they have few details other than that one or more people are present at a location and are armed. . . . Consequently, the law enforcement response is one of 'hypervigilant urgency' in order to protect the public from an armed threat. Should the gun carrying person fail to comply with law enforcement or move in a way that could be construed as threatening, the police are forced to respond in kind for their own protection. It's well and good in

hindsight to say the gun carrier was simply 'exercising their rights' but the result could be deadly.[5]

In sum, the USPS has a significant interest in averting the spike in gun crimes and accidental shootings that result from unrestricted public carrying. Moreover, the USPS Regulation is not an outright ban on public possession or carrying of firearms and thus does not even approach the blanket prohibition on handgun possession that the Supreme Court struck down in *Heller*. Instead, it merely prohibits the carrying of weapons "*on postal property*."   39 C.F.R. § 232.1(*l*).  The government has made a decision that this is an appropriate way to protect public safety.  Appellees provide no basis to second-guess that judgment.

## CONCLUSION

For the foregoing reasons, *amicus* respectfully requests that the Court reverse the district court's holding that the USPS Regulation, as applied to the parking lot, is unconstitutional.

Dated: November 26, 2013          Respectfully submitted,

s/Jonathan L. Diesenhaus
Jonathan L. Diesenhaus
S. Chartey Quarcoo
Kathryn L. Marshall
Hogan Lovells US LLP

---

[5] San Mateo County Sheriff's Office, "Unloaded Open Carry" (Jan. 14, 2010), http://www.co.sanmateo.ca.us/Attachments/sheriffs/pdfs/Press%20Releases/20100114_opencarry.pdf.

555 13th Street, N.W.
Washington, DC 20004

Jonathan E. Lowy
Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye Street, N.W., Suite 1100
Washington, DC 20005

Counsel for *Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that this brief was produced in Times New Roman 14 point typeface using Microsoft Word 2008, is less than half the length permitted for Appellants' briefs under the Federal Rules of Appellate Procedure, and contains 5,462 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

s/ Jonathan L. Diesenhaus

## CERTIFICATE OF DIGITAL SUBMISSION

Counsel for *amicus curiae* Brady Center to Prevent Gun Violence hereby certifies that:

1.     There are no required privacy redactions to be made in this brief.

2.     The hard copies to be submitted will be exact copies of the electronically filed version of this brief.

2.     The digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program (Symantec Endpoint Protection, Version 11.0.4000.2295, updated July 17, 2011) and, according to the program, are free of viruses.

<u>s/ Jonathan L. Diesenhaus</u>

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of November, 2013, pursuant to Tenth Circuit Rule 25.4 and 31.5, the foregoing Brief *Amicus Curiae* of Brady Center Against Gun Violence in Support of Appellees was served electronically on all parties through the Court's CM/ECF system.


s/ Jonathan L. Diesenhaus