**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**June 26, 2015**

**UNITED STATES COURT OF APPEALS**

**Elisabeth A. Shumaker**
**Clerk of Court**

**TENTH CIRCUIT**

---

TAB BONIDY; NATIONAL
ASSOCIATION FOR GUN RIGHTS,

    Plaintiffs - Appellees/Cross-
    Appellants,

v.

UNITED STATES POSTAL SERVICE;
PATRICK DONAHOE, Postmaster
General; MICHAEL KERVIN, Acting
Postmaster, Avon, Colorado,

    Defendants - Appellants/
    Cross-Appellees.

Nos. 13-1374, 13-1391

---

BRADY CENTER TO PREVENT GUN
VIOLENCE,

    Amicus Curiae.

---

**APPEALS FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 1:10-CV-02408-RPM)**

---

Daniel Tenny, Attorney (Stuart F. Delery, Assistant Attorney General, John F. Walsh, United States Attorney, and Michael S. Raab, Attorney, with him on the briefs), Civil Division, United States Department of Justice, Washington, D.C. for Defendants-Appellants/Cross-Appellees.

Steven J. Lechner (James M. Manley, with him on the briefs) Mountain States Legal Foundation, Lakewood, Colorado, for Plaintiffs-Appellees/Cross-Appellants.

Jonathan L. Diesenhaus, S. Chartey Quarcoo, and Kathryn L. Marshall, Hogan Lovells US LLP, Washington, D.C.; and Jonathan E. Lowy, Brady Center to Prevent Gun Violence, Legal Action Project, Washington, D.C., filed an amicus curiae brief for Brady Center to Prevent Gun Violence.

---

Before **TYMKOVICH, EBEL,** and **PHILLIPS,** Circuit Judges.

---

**EBEL**, Circuit Judge.

---

Plaintiff Tab Bonidy, who has a concealed-carry permit under Colorado law, sued the United States Postal Service (USPS) challenging 39 C.F.R. § 232.1(l) (hereinafter "the regulation"), which prohibits the storage and carriage of firearms on USPS property. Bonidy claims the regulation is unconstitutional as applied to him because it violates his Second Amendment right to (1) bring his gun into the United States Post Office building in Avon, Colorado (hereinafter "post office building"), and (2) store the gun in the post office parking lot while he picks up his mail. The district court ruled, on cross-motions for summary judgment, that the regulation is constitutional insofar as it prohibits guns in

the building, but unconstitutional insofar as it prohibits guns in the parking lot. Both parties appeal.

We have jurisdiction under 28 U.S.C. § 1291 and conclude that the regulation is constitutional as to all USPS property at issue in this case, including the Avon Post Office parking lot, because the Second Amendment right to bear arms has not been extended to "government buildings." Government buildings, in this context, includes the government owned parking lot connected to the U.S. Post Office. Alternatively, even if we were to conclude that the parking lot did not qualify as a "government building," we would uphold this regulation as constitutional as applied to the parking lot under independent intermediate scrutiny.

## I.    FACTS

Tab Bonidy lives in a rural area near Avon, Colorado. He has a concealed carry permit under Colorado law and regularly carries a handgun for self-defense. Avon's post office does not deliver mail to residents' homes; instead, it provides mailboxes in the post office building, and residents travel there to collect their mail. The post office lobby, where residents' mailboxes are located, is open to the public at all times. The post office does not regularly employ any security officers.

The post office building is a standalone structure with two adjacent parking lots: one is a restricted-access employee lot, and the other is an unsecured customer lot. A sign indicates that the customer lot is USPS property. There are also several city-owned public

parking options nearby: five spots on the street in front of the post office,  and three

parking lots.

Because of the USPS firearms restriction, Bonidy has an assistant pick up his mail

at the post office. Bonidy's attorney sent a letter to the USPS's General Counsel asking

whether Bonidy would be prosecuted under the regulation if he carried his firearm into

the post office building or stored it in his vehicle in the post office parking lot while

collecting his mail. The USPS General Counsel replied in the affirmative, stating that

"the regulations governing Conduct on Postal Property prevent [Bonidy] from carrying

firearms, openly or concealed, onto any real property under the charge and control of the

Postal Service."  Aplt. App. A20.

Bonidy sued for declaratory and injunctive relief, claiming that the regulation

violated his Second Amendment right to bear arms for self-defense. After full discovery,

Bonidy and the USPS filed cross-motions for summary judgment. The district court held

that the regulation is constitutional insofar as it pertains to concealed firearms, based on

Peterson v. Martinez, 707 F.3d 1197 (10th Cir. 2013), which held that the Second

Amendment protection does not include a right to carry a concealed firearm outside the

home.  The district court, applying a presumption of validity to the Postal Regulation and

apparently applying a form of intermediate scrutiny, concluded that the regulation was

constitutional as it applied to the post office building itself, but it was unconstitutional at

least insofar as it prohibited Bonidy from carrying a gun in his car in the parking lot

consistent with his Concealed Carry Permit.  The government appealed the ruling

4

invalidating 39 C.F.R. § 232.1(1) insofar as carrying a gun in a car in the parking lot was concerned and Bonidy cross appealed, arguing that 39 C.F.R. §232.1(1) was unconstitutional both with regard to the postal building itself and the adjacent postal office parking lot.

## II. STANDARD OF REVIEW

We review the district court's grant of summary judgment and interpretation of the Second Amendment de novo. See Peterson, 707 F.3d at 1207; United States v. Huitron-Guizar, 678 F.3d 1164, 1165 (10th Cir. 2012). "Summary judgment is proper if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Peterson, 707 F.3d at 1207.

## III. ANALYSIS

Peterson, of course, controls our panel, and in accordance with that opinion we affirm the district court's ruling that 39 C.F.R. § 232.1(1) is constitutional insofar as it pertains to concealed carry, both in the postal building itself and the adjacent parking lot. With regard to open carry, we affirm the district court's ruling upholding the constitutionality of 39 C.F.R. § 232.1(1) insofar as the postal building itself is concerned and we reverse the district court's ruling invalidating 39 C.F.R. § 232.1(1) insofar as it pertains to open carry in the postal office adjacent parking lot.

With regard to the issue of open carry, we are constrained by previous Tenth Circuit precedent.  Our precedent on this matter is anchored in a single sentence contained in <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008) which extended Second Amendment rights to private citizens for the first time in U.S. Supreme Court precedent, holding that Washington D.C.'s  ban on handgun possession in the home violates the Second Amendment.  <u>Id.</u>, at 635.

In addition to the narrowness of that holding, the United States Supreme Court then proceeded to emphasize the narrowness by saying,

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial side of arms.[1]

<u>Heller</u>, 554 U.S. at 626–27.

Although one could argue that language was dicta, it was in fact an important emphasis upon the narrowness of the holding itself and it directly informs the holding in that case.

Then, to underscore the importance of that language and to remove any doubt about the care that went into it and its importance in understanding the holding in <u>Heller</u>, several years later the Court repeated that exact same language, with forceful affirmation.

---

[1] The Supreme Court attached a footnote immediately after this language saying, "We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive."

In McDonald v. City of Chicago, Illinois, 561 U.S. 742 (2010), a plurality of the Court said:

> We made it clear in Heller that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' Id., at _____, 128 S. Ct., at 2816-2817. We repeat those assurances here. Despite municipal respondent's doomsday proclamations, incorporation does not imperil every law regulating firearms.

Id. at 786 (emphasis added).

Bonidy suggests that this language is mere dicta and suggests that we should disregard it. But, we reject that suggestion. First, we have previously held that we are "bound by Supreme Court dicta almost as firmly as by the Courts' outright holdings, particularly when the dicta is recent and not enfeebled by later statements." United States v. Serawop, 505 F.3d 1112, 1122 (10th Cir. 2007); Surefoot LC v. Sure Foot Corp., 531 F.3d 1236, 1243 (10th Cir. 2008). Second, this dicta squarely relates to the holdings itself, and therefore is assuredly not gratuitous. Third, this dicta was subsequently repeated largely verbatim and reendorsed by the Court several years later in McDonald, 561 U.S. at 925.

Since Heller and McDonald we have quoted that same sentence and considered ourselves bound by it. See Peterson v. Martinez, 707 F.3d 1197 (10th Cir. 2013) (upholding concealed carry restrictions). Thus, our own precedent causes us to conclude that the Second Amendment right to carry firearms does not apply to federal buildings,

such as post offices.  Therefore, we uphold the District Court's ruling that 39 C.F.R. § 232.1(1) is constitutional as to the post office building itself.

Next, we address the application of that prohibition on the U.S. Postal Service parking lot adjacent to the building itself.

We conclude, on the facts of this case, that the parking lot should be considered as a single unit with the postal building itself to which it is attached and which it exclusively serves.  There is, in fact, a drop-off box for the post office in the parking lot, meaning that postal transactions take place in the parking lot as well as in the building.  Thus, the previously quoted language in Heller applies with the same force to the parking lot as to the building itself.

However, because the parking lot presents a closer question, we offer an equal and alternative basis for our holding upholding 39 C.F.R. § 232.1(1) as it applies to the parking lot.  This alternative holding assumes that the right to bear arms recognized in Heller in the home would also apply, although with less force, outside the home.  This seems like a reasonable assumption because the Second Amendment right is "to keep and bear" arms, and "bear" certainly implies the possibility and even the likelihood that the arms will be carried outside the home.  Also, the Second Amendment right recognized by the Supreme Court is predicated on the right of self-defense.  Heller, 554 U.S. at 595. The need for self-defense, albeit less acute, certainly exists outside the home as well.

8

Moore v. Madigan, 702 F.3d 933, 935–40 (7th Cir. 2012). [2]  However, it is not necessary for us to make a definitive ruling on this because, as noted below, even assuming a right to bear firearms outside the home, and even if, contrary to our ruling above, the parking lot is not itself considered part of a "government building," we conclude that any such right Bonidy might possess was not violated here by 39 C.F.R. § 232.1(1) precluding him from possessing a firearm in the postal parking lot.

If Second Amendment rights apply outside the home, we believe they would be measured by the traditional test of intermediate scrutiny.  See United States v. Reese, 627 F.3d 792, 802 (10th Cir. 2010) (applying intermediate scrutiny to a Second Amendment as-applied challenge to § 922(g)(8)).

Intermediate scrutiny makes sense in the Second Amendment context.  The right to carry weapons in public for self-defense poses inherent risks to others.  Firearms may create or exacerbate accidents or deadly encounters, as the longstanding bans on private firearms in airports and courthouses illustrate.  The risk inherent in firearms and other weapons distinguishes the Second Amendment right from other fundamental rights that have been held to be evaluated under a strict scrutiny test, such as the right to marry and the right to be free from viewpoint discrimination, which can be exercised without creating a direct risk to others.  Intermediate scrutiny appropriately places the burden on

---

[2] The Court did stress that the right to bear arms for self-defense is not a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Heller, 554 U.S. at 626.  So it is clear that this right is neither absolute nor unqualified.

the government to justify its restrictions, while also giving governments considerable flexibility to regulate gun safety.

The USPS is a state actor rather than a private business, so its actions must comply with the Constitution. However, the fact that the government is acting in a proprietary capacity, analogous to that of a person managing a private business, is often relevant to constitutional analysis. The government often has more flexibility to regulate when it is acting as a proprietor (such as when it manages a post office) than when it is acting as a sovereign (such as when it regulates private activity unconnected to a government service).

In Commerce Clause cases, for example, a "basic distinction" exists "between States as market *participants* and States as market *regulators*." <u>Reeves, Inc. v. Stake</u>, 447 U.S. 429, 436 (1980) (emphasis added). Similar distinctions exist with respect to the First Amendment. <u>See, e.g.</u>, <u>Lehman v. City of Shaker Heights</u>, 418 U.S. 298, 302–04 (1974) (holding that a city's decision to exclude political advertisements from its buses was permissible under the First Amendment because the city was acting as a proprietor); <u>Adderley v. Florida</u>, 385 U.S. 39, 47–48 (1966) ("The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."). That distinction between government as market participant and government as market regulator is relevant here as well.

The USPS is an enormous, complex business. If the USPS were a private company, it would be in the top 50 of the Fortune 500. In 2013 alone, it processed over

158 billion pieces of mail, about 40% of the world's mail volume, and had a revenue of $67.3 billion. It employed over half a million Americans, managed a fleet of more than 211,000 vehicles, had more than 31,000 retail offices across the United States, processed more than 5 million passports, and issued around 95 million money orders. See United States Postal Service, Postal Facts 2014.

As a government-owned business acting as a proprietor rather than as a sovereign, the USPS has broad discretion to govern its business operations according to the rules it deems appropriate. In light of that discretion, the contrast between the regulation challenged here and the bans struck down in Heller and McDonald is stark. Those bans regulated wholly private activity and applied directly to every citizen within the respective jurisdictions. By contrast, the regulation challenged here applies only to discrete parcels of land owned by the U.S. Postal Service, and affects private citizens only insofar as they are doing business with the USPS on USPS property. And the regulation is directly relevant to the USPS's business objectives, which include providing a safe environment for its patrons and employees.

This regulation, 39 C.F.R. §232.1(1), is substantially related to the USPS's important interest in creating a safe environment for its patrons and employees. As noted, the USPS has considerable flexibility when operating as a proprietor of a state-owned business rather than regulating private activity. Our conclusion is further bolstered by the fact that the regulation applies only to a very limited spatial area (that is,

USPS facilities) and affects private citizens only insofar as they are doing business with the USPS on USPS property.

Of course, administrative convenience and economic cost-saving are not, by themselves, conclusive justifications for burdening a constitutional right under intermediate scrutiny. However, such considerations are relevant to our conclusion that the USPS may create administratively manageable, uniform regulations that apply to all USPS property and customers, so long as these rules are substantially related to the USPS's important interest in employee and customer safety, which tests we find to be met here.

Bonidy argues that the USPS regulation is overinclusive with respect to its safety objectives.  Unlike most post offices, the Avon post office does not provide residential delivery, so patrons must personally pick up their mail (or have someone else do so on their behalf, as Bonidy does). The lobby is open to the public at all times. Bonidy argues that because the building is relatively unsecured, and there is usually no security guard on the premises, the regulation forces him to "risk his life to pick up his mail."  Bonidy argues that the USPS should have devised site-specific safety policies to compensate for customers' desire to carry firearms at post offices in rural areas like Avon.

But the USPS is not required to tailor its safety regulations to the unique circumstances of each customer, or to craft different rules for each of its more than 31,000 post offices, or to fashion one set of rules for its parking lots and another for its buildings and perhaps another for the steps leading up to the building. Intermediate

12

scrutiny does not require a perfect fit between a rule's objectives and the circumstances of each individual subject to the rule.  To require the USPS to tailor a separate gun policy for each of its properties or indeed for its many diverse customers would present an impossible burden not required by the intermediate scrutiny test.

Bonidy has a licensed concealed-carry permit under Colorado law. But there is no national registry of firearms carry permits.  Gun carry laws differ in different states and localities, and such laws vary widely in their requirements and level of enforcement. Consistent with the Supremacy Clause, the USPS and other federal agencies need not stop every customer at the government's property lines to inquire whether each has a valid, active firearms license under state or local law.  Local and state laws do not trump federal laws, and those local and state regulations do not give Bonidy a right to openly carry a firearm on sensitive federal property. Thus, Bonidy's right to carry in Colorado does not undermine the constitutionality of this USPS regulation.

The USPS, as a federal business, may create and enforce a single, national rule regarding carrying firearms onto postal property.  Such regulations will inevitably impact some individuals more than others.  However, an alternative system involving piecemeal exceptions and individual waivers would be wasteful and administratively unworkable, and would raise entirely new problems related to fairness, official discretion, and equal administration of the laws. There is no reason to believe that a regulatory regime in which ad hoc exceptions are made for people like Mr. Bonidy would be superior, as a matter of sound policy or constitutional law, to a single bright-line rule such as the regulation

challenged here. Under a more nuanced or discretionary regime, problems of perceived

unfairness or unreasonableness—and accompanying litigation—would likely multiply,

not disappear. As the Supreme Court has explained:

> If Congress and the Postal Service are to operate as efficiently as possible a
> system for the delivery of mail which serves a Nation extending from the
> Atlantic Ocean to the Pacific Ocean, from the Canadian boundary on the
> north to the Mexican boundary on the south, it must obviously adopt
> regulations of general character having uniform applicability throughout the
> more than three million square miles which the United States embraces. In
> so doing, the Postal Service's authority to impose regulations cannot be
> made to depend on . . . factors that may vary significantly within a distance
> of less than 100 miles.

U. S. Postal Serv. v. Council of Greenburgh Civic Associations, 453 U.S. 114, 133

(1981).

We do not second-guess the wisdom of the USPS's determination that its business

operations will be best served by a simple rule banning all private firearms from postal

property; our role is limited to inquiring whether that rule violates the Constitution, and

we conclude that it does not. The regulation is sufficiently tailored to the USPS's

important interest in safety under an intermediate scrutiny analysis.

The USPS is not constitutionally required to tailor a separate gun carry policy with

respect to each of its properties.  It suffices that the regulation as a whole is substantially

related to the USPS's important interest in patron and employee safety.   cf., e.g.,

Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 419 (1922) ("Ordinarily a police

regulation, general in operation, will not be held void as to a particular property, although

proof is offered that owing to conditions peculiar to it the restriction could not reasonably be applied.").

Post office parking lots, including Avon's, often include collection boxes, so postal business extends beyond the walls of the building. Further, patrons must often pass through a USPS-owned parking lot to get to the door of a post office building. Also, the security of the postal building itself is integrally related to the security of the parking lot adjacent to it. The security of the postal building and the security of postal services within the structure are integrally connected with the security of the adjacent lot as well. Cash and other items of considerable value are often shipped through the postal services and if guns are considered a security risk in the building, they present a similar risk while patrons are transporting those materials to or from an immediately adjacent government owned parking lot. The postal building and the parking lot are operated as a single integrated facility. In any event, the judgment, made by the postal service in enacting and applying 39 C.F.R. § 232.1(1), is constitutionally defensible under intermediate scrutiny. The USPS may constitutionally create a single rule pertaining to guns governing both its buildings and parking lots.

## IV. CONCLUSION

Accordingly, we AFFIRM the district court order to the extent it upheld 39 C.F.R. § 232.1(1) as applied to the Avon post office building. We REVERSE the district court order to the extent it found that regulation unconstitutional as applied to Bonidy's request

15

to be able to carry a gun in his vehicle onto the Avon post office parking lot.  We

REMAND for entry of judgment consistent with this opinion.

13-1374, 13-1391, *Bonidy v. United States Postal Service*

**TYMKOVICH**, Circuit Judge, concurring in part and dissenting in part:

Tab Bonidy is a licensed gun owner in Colorado who wants to carry his firearm when he picks up mail from a ski town post office. He asserts a right to (1) carry a firearm within the post office itself, or, at the very least, (2) store a gun in his truck in the public parking lot owned by the post office. A federal regulation prevents him from doing either.[1]

Our precedent requires us to apply intermediate scrutiny to this regulation. And I agree with the majority that under intermediate scrutiny the Postal Service's regulation is valid as applied to gun possession *inside* the post office, particularly given the Supreme Court's dicta in *District of Columbia v. Heller*, 554 U.S. 570 (2008), which deemed regulations of firearms in sensitive places like government buildings presumptively lawful. It is a close call, but Bonidy has on balance not rebutted that presumption.

But the presumption of lawfulness associated with sensitivity does not necessarily hold in the adjacent parking lot. And, to the extent they exist at all, the unique characteristics supporting the regulation's validity within the post office are far weaker in the parking lot. Accordingly, I disagree with the majority

---

[1] The regulation reads in full: "Weapons and explosives. Notwithstanding the provisions of any other law, rule or regulation, no person while on postal property may carry firearms, other dangerous or deadly weapons, or explosives, either openly or concealed, or store the same on postal property, except for official purposes."  39 C.F.R. § 232.1(l).

on two points.  First, I would explicitly hold in this case that the Second Amendment applies outside the home instead of assuming but not deciding it does, as the majority concludes.  My view is that the Second Amendment is not confined to home self-defense, and that conclusion follows naturally from *Heller*, *McDonald v. City of Chicago*, 561 U.S. 742 (2010), historical sources, and persuasive circuit cases that have considered the issue.

Second, I would affirm the district court's invalidation of the regulation as applied in the parking lot.  Intermediate scrutiny requires the Postal Service to prove that its regulation prohibiting Mr. Bonidy from storing his gun in a parked car is substantially related to an important government interest.  It has not.

Of course I agree public safety—at not too amorphous a level of generality—qualifies as an important government interest.  But the government has not shown that successfully combating potential crime at this location—a run-of-the-mill post office parking lot in a Colorado ski town—hinges on restricting the Second Amendment rights of lawfully licensed firearms carriers.  Consequently, it cannot possibly show that preventing those individuals from storing their firearms in their cars is substantially related to preventing criminality.  Thus, *as applied in this case*, the regulation restricts far more conduct than is necessary to protect the asserted government interest.

Because I would AFFIRM the district court's invalidation of the regulation as applied to the parking lot, I dissent from that part of the majority opinion.

2

# I.

## A. *The Second Amendment Outside the Home*

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. As I read the Supreme Court's Second Amendment cases, coupled with a review of historical sources, the right extends to self defense outside the home. I would join the Seventh Circuit's decision in *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), in affirming that principle.[2]

### 1. Heller *and* McDonald *on the Scope of the Right*

*Heller* and *McDonald* do not speak directly to whether the Second Amendment right extends beyond the home. But we can answer that question by faithfully applying those opinions and the principles they establish. A fair reading of those opinions admits no other conclusion than that the right to keep and bear arms protects gun owners outside the home. We should address the question directly and provide guidance for our district courts.

*Heller* explains that the Second Amendment's meaning and scope flows

---

[2] Of course, as the majority notes, we held in *Peterson v. Martinez*, 707 F.3d 1197 (10th Cir. 2013), that the scope of the right does not include the right to carry a *concealed* firearm outside the home. *Id.* at 1209. The proposition I would explicitly decide, rather than assume, is that the more general right to carry a firearm extends outside the home and must be respected by government entities. *See Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1172 (9th Cir. 2014) (noting that "prescrib[ing] a particular manner of carry," *e.g.*, by "favoring concealed carry over open carry," does not "offend the Constitution, so long as [the government] allows one of the two"), *reh'g en banc granted*, 781 F.3d 1106 (9th Cir. 2015).

from the "normal and ordinary" meaning of its words as understood by "ordinary citizens in the founding generation." *Heller*, 554 U.S. at 576–77. At the Founding, Americans understood the right secured by the Second Amendment to be "an individual right protecting against *both* public and private violence." *Id.* at 594 (emphasis added). The Second Amendment protects the right of self-defense, the need for which is "*most* acute in the home." *McDonald*, 561 U.S. at 767 (emphasis added) (internal quotation marks omitted). But the Amendment also guarantees the right to "possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. And the founding generation believed the right important for both "self-defense and hunting." *Id.* at 599. Of course, *Heller* included a list of multiple locations outside the home where some gun restrictions might be "presumptively lawful," *id.* at 626 (listing schools and government buildings), naturally implying that restrictions on free carry in other locations would be granted no such presumption.

Thus, I think it incontestable that the Second Amendment applies outside of home self-defense. Violence occurs outside the home, and to call the need for self-defense most acute in the home is to acknowledge it exists elsewhere. Confrontations do not just occur in the home, and hunting never does. And clarifying the presumptive lawfulness of firearms regulations in schools and government buildings would be unnecessary if the Amendment had no force outside the home. *See* David B. Kopel, *Does the Second Amendment Protect*

4

*Firearms Commerce?*, 127 Harv. L. Rev. F. 230, 235–36 (2014) ("The exception proves [the] rule . . . . If the Second Amendment only applied to the keeping of arms at home, and not to the bearing of arms in public places, then there would be no need to specify the exception for carrying arms in 'sensitive places.'").

The Court's understanding of the Amendment's key terms bolsters this conclusion. "Keep arms" means to "have weapons," and "bear arms" means to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Heller*, 554 U.S. at 582–84 (alterations in original) (internal quotation marks omitted). Only an unrealistic reading of that language could restrict the right to the home, and it is hard to believe a founding generation who routinely carried weapons for protection outside the home and traveling would agree.

### 2. *The Historical Evidence*

To the extent founding-era sources bear on the question, they support this conclusion.

*Heller* dubbed Blackstone the "preeminent authority on English law for the founding generation." *Heller*, 554 U.S. at 593–94. Blackstone described the right to bear arms as the right of "having and using arms for self-preservation and defence" and the "natural right of resistance and self-preservation." *Id.* at 594. To be sure, he stressed that the right, like others, may be placed under "necessary

5

restraints" to prevent "what would be pernicious either to ourselves or our fellow citizens." 1 Commentaries on the Laws of England 140 (1765). But nothing in Blackstone suggests the right is restricted to the home.

And in what *Heller* called "the most important early American edition of Blackstone's Commentaries," *Heller*, 554 U.S. at 594, St. George Tucker concluded that "Americans understood the right of self-preservation as permitting a citizen to repe[l] force by force when the intervention of society in his behalf, may be too late to prevent an injury." *Id.* at 595 (quoting 1 Blackstone's Commentaries 145–46 (1803)) (alteration in original) (internal quotation marks omitted). And, speaking in 1803 of the right to bear arms "recognized and secured in the constitution itself," Tucker noted that in "many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than a European fine gentleman without his sword by his side." Michael P. O'Shea, *Modeling the Second Amendment Right to Carry Arms (I): Judicial Tradition and the Scope of "Bearing Arms" for Self-Defense*, 61 Am. U. L. Rev. 585, 637–38 (2012).

During the founding era, moreover, Americans were no strangers to firearm regulation. Laws "regulated the discharge, storage, and aggressive use of firearms," and "disarmed people who were considered untrustworthy in some capacity." Jonathan Meltzer, Note, *Open Carry for All:* Heller *and Our Nineteenth-Century Second Amendment*, 123 Yale L.J. 1486, 1505 (2014). Yet

"there were no direct statutory bans on the carry of arms [outside the home]." *Id.* at 1499, 1505. Notably, Boston, New York, and Philadelphia all "prohibited the shooting of guns within city limits"—further suggesting that carrying firearms outside the home was a background norm. *See id.* at 1508.

Paired with the language from *Heller* and *McDonald*, this historical evidence bolsters the conclusion that the drafters of the Second Amendment enshrined a right extending beyond the home.

### 3. Other Circuits

Persuasive recent analyses of the Amendment's text and relevant history by the Seventh and Ninth Circuits further show that the Amendment protects a right that extends beyond the home. *See Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1152–53, 1172 (9th Cir. 2014), *reh'g en banc granted*, 781 F.3d 1106 (9th Cir. 2015); *Moore*, 702 F.3d at 935–36, 942.[3] In *Peruta*, for example, an exhaustive analysis of text and history led the court to conclude that "the carrying of an operable handgun outside the home for the lawful purpose of self-defense . . . constitutes bearing Arms within the meaning of the Second Amendment." *Peruta*, 742 F.3d at 1166 (internal quotation marks omitted; alterations incorporated). The Seventh Circuit in *Moore* thought the answer obvious from the Amendment's plain meaning and avoided a lengthy historical analysis; simply put, the "Supreme

---

[3] Although the Ninth Circuit will rehear *Peruta* en banc, the majority opinion's careful analysis is made no less persuasive by that pending hearing.

7

Court has decided that the amendment confers a right to bear arms for self-defense, which is as important outside the home as inside." *Moore*, 702 F.3d at 942.

No circuit has held otherwise. With that in mind, I now turn to the permissibility of this regulation.

### B. Intermediate Scrutiny

We apply a "two-pronged approach to Second Amendment claims." *Peterson v. Martinez*, 707 F.3d 1197, 1208 (10th Cir. 2013) (internal quotation marks omitted). First, we ask "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id.* As the majority assumes (and I would hold), this regulation burdens the right to carry a firearm outside the home. When a burden exists, we "evaluate the law under some form of means-end scrutiny," *id.*, which requires asking whether an important state "objective is advanced by means substantially related to that objective." *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010). In light of our past cases, I agree with the majority that intermediate scrutiny is the appropriate form of scrutiny for this regulation.[4] But I disagree with the

---

[4] We have generally looked to the restrictiveness of the challenged regulation in determining the appropriate level of scrutiny. *Reese*, 627 F.3d at 801–02. In both *Reese*, *see id.* at 802–04, and *United States v. Huitron-Guizar*, 678 F.3d 1164, 1169 (10th Cir. 2012), we applied intermediate scrutiny to regulations that prohibited firearms at all times and in all locations for an entire group of people.

majority's conclusion that the ends justify the means in the particular circumstances here.

### 1. Our Particular Circumstances

In this as-applied challenge, the central issue is whether this regulation is constitutional under the "particular circumstances of the case," notwithstanding its potential constitutionality in "many of its applications." *United States v. Carel*, 668 F.3d 1211, 1217 (10th Cir. 2011). A "statute may be invalid as applied to one state of facts and yet valid as applied to another." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006). Challenging the enforcement or regulation as to the plaintiff and the particular circumstances implicated is the "hallmark of an as-applied challenge." *Scherer v. U.S. Forest Serv.*, 653 F.3d 1241, 1243 (10th Cir. 2011); *see also Citizens United v. Gessler*, 773 F.3d 200, 216 (10th Cir. 2014) ("Courts can . . . recognize the overall propriety of a statutory scheme while still invalidating its application in a specific case.").

What are the particular circumstances here? The majority correctly describes some of the relevant circumstances—for example, that valuable items are often shipped through the mail. And the government details at length how criminals have targeted some post offices as well as the administrative benefits the blanket firearms ban provides the Postal Service. But those realities fail to fully address this case's relevant facts.

9

A complete view of the facts here considers the restraints this law places on *who* may carry a firearm and *where* he may carry it. *See United States v. Huitron-Guizar*, 678 F.3d 1164, 1166 (10th Cir. 2012) (noting that the right to bear arms "is qualified by what one might call the 'who,' 'what,' 'where,' 'when,' and 'why'"). The "who" reveals a regulation that makes no distinction between those that pose heightened security risks and those that do not. As applied here, it burdens the Second Amendment rights of Bonidy and Coloradans like him who have passed a background check and are authorized under state law to carry a concealed handgun. The background check confirms that permit holders have met a laundry list of minimum standards, including not being subject to any protection order, not having committed perjury in the past, not abusing drugs or alcohol, and not posing a threat to themselves or others. *See* Colo. Rev. Stat. § 18-12-203. Colorado intended those minimum standards to ensure that concealed carriers were law-abiding, trustworthy individuals.

The "where" is simple: *this* post office has no security personnel or devices—perhaps understandably, since the government provides no evidence of crime or security threats at *this* post office. No one suggests that it is an aberration in this respect; it must be one of many post offices posing no unique security threat.[5] Without addressing these relevant facts, the government has not

---

[5] Attached as an appendix are two views of rural Colorado post offices that help illustrate their geography.

discharged the burden it bears in an as-applied challenge.

Those are the relevant facts. I turn now to the appropriate intermediate scrutiny inquiry, as delineated by our as-applied Second Amendment cases.

### 2. *Our As-Applied Second Amendment Cases*

We have not often had occasion to apply intermediate scrutiny to an as-applied Second Amendment challenge. Consequently, our two cases doing so require close attention.

Our first post-Heller case applying intermediate scrutiny was *Reese*, which addressed an as-applied challenge to 18 U.S.C. § 922(g)(8)'s prohibition on firearm possession for anyone subject to a domestic violence protective order. *Reese*, 627 F.3d at 799, 801–02. After concluding that intermediate scrutiny applied, we asked whether the government had proven that "its objective [was] an important one and that its objective [was] advanced by means substantially related to that objective." *Id.* at 802. No one there questioned the importance of keeping firearms away from domestic abusers, whose high recidivism rate means they pose a heightened risk of violence. The real question was the substantial-relation inquiry.

In that inquiry, we emphasized the need to determine whether the regulation was "substantially related to [its] objective in [Reese's particular] case." *Id.* at 803. Because Reese was subject to a qualifying protective order, prosecuting him was "consistent with the government's intended purpose in

11

implementing [the] statute." *Id.* at 804.  That is, we found substantial relation because preventing people of his class (those under domestic-violence protective orders) from possessing guns was precisely the important objective at which the statute aimed.

To be sure, substantial relation does not require every individual in the class to exemplify the important objective.  In *Huitron-Guizar*, for example, we applied intermediate scrutiny to 18 U.S.C. § 922(g)(5)(A), which prohibits unlawfully present aliens from possessing guns.  *Huitron-Guizar*, 678 F.3d at 1169.  Crime control and public safety sufficed as important objectives.  *Id.* at 1170.

We said the statute was substantially related to those objectives, even though it was "surely a generalization to suggest . . . that unlawfully present aliens" invariably pose a heightened threat to public safety.  *Id.*  We added that "general laws deal in generalities," and noted our approval of felon-dispossession laws despite the reality that not all felons pose a threat of violence.  *See id.*  It was enough that Congress "[might] have concluded" that such aliens posed this danger, *id.*, although none of the opinion's facts indicated that Huitron-Guizar himself posed that heightened danger.

Thus, *Huitron-Guizar* reaffirms *Reese*, but adds another element to our analysis.  As in *Reese*, we rejected Huitron-Guizar's challenge because preventing people of his class from possessing firearms was precisely the problem the statute

12

aimed to solve.  But the case also establishes that we permit prophylaxis.  When individuals belong to a group posing a heightened threat to a government interest (like public safety), the government may sometimes apply the statute to them even absent any individualized indication of heightened risk.

*Reese* and *Huitron-Guizar* provide one key principle for discerning whether a regulation is "substantially related" in an as-applied Second Amendment challenge: We must ask whether it is "consistent"—in light of the asserted government interest—to apply the regulation to the plaintiff's particular circumstances.  *Reese*, 627 F.3d at 803–04.

To be clear, I do not believe our cases require a substantial relation to each *individual plaintiff*.  That would transform this inquiry into something like a strict scrutiny narrow-tailoring regime.  Rather, the proper question is whether the regulation is substantially related to the *type of case* exemplified by the gun owner's claim.

That is why, when we examined the substantial-relationship question in *Huitron-Guizar*, we scrutinized the fit of the statute's generalizations about unlawfully present aliens "as a *group*."  *Huitron-Guizar*, 678 F.3d at 1170 (emphasis added).  Similarly, in *Reese* we endorsed the government's assertion that Reese failed to "demonstrate that he belongs to a severable subcategory of persons as to whom the statute is unconstitutional."  *Reese*, 627 F.3d 803–04. Accordingly, a regulation can survive an as-applied challenge even when the

13

plaintiff himself does not pose the threat the regulation aims to solve. *Cf. Ward v. Rock Against Racism*, 491 U.S. 781, 801 (1989) (noting in the time, place, and manner context that "the validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case"); *United States v. Edge Broad. Co.*, 509 U.S. 418, 430–31 (1993) (stating courts judge restrictions "by the relation [they bear] to the general problem" posed, not "by the extent to which it furthers the Government's interest in an individual case").

Thus, an as-applied challenge asks whether it is unconstitutional to apply the law to a particular category of persons. But not every fact of a case defines the category; only facts bearing on the right burdened and the interest pursued shape our inquiry.

Unsurprisingly, therefore, the characteristics of the individual bringing the as-applied challenge—the "who"—carry great weight, both in defining the relevant category and in determining whether the government may apply the regulation in these circumstances. For example, imagine that Bonidy was arrested during an armed post office robbery. He could not then seriously argue that a statute aimed at preventing gun violence on postal property bore no substantial relation to him and other armed robbers.

Similarly, the characteristics of the location at issue—the "where"—bear on

14

this analysis.[6]  A regulation may of course speak generally to a type of property.

But the government's interest may be unusually weak regarding a particular

subcategory of that property—it is not enough to say that *every* government

building, lot, or park will be treated the same.  In such a case, we should hesitate

before holding a prophylactic general regulation substantially related to its

objective.

That location matters to a scrutiny analysis is a familiar part of other areas

of constitutional analysis.  For example, in First Amendment forum analysis,

courts examine a property's "location and purpose" to determine whether it

"constitutes a public forum" and consequently what type of scrutiny to apply.  *See*

*United States v. Kokinda*, 497 U.S. 720, 728–29 (1990) (plurality opinion); *id.* at

737–38 (Kennedy, J., concurring) (agreeing that the particular activities taking

place on "this postal [property]" bore on whether the property at issue was

nonpublic).  Consequently, courts may scrutinize two otherwise identical

properties differently depending on their location.  And in election matters, the

courts have little difficulty in giving appropriately increased weight to the fact

that a particular regulation only restricts electioneering at or near a polling place.

*See, e.g.*, *Burson v. Freeman*, 504 U.S. 191, 199–200, 211 (1992) (plurality

opinion); *Minnesota Majority v. Mansky*, 708 F.3d 1051, 1055, 1057–58 (8th Cir.

---

[6] Understandably, *Reese* and *Huitron-Guizar* do not make this point
explicitly, since the regulations in those cases banned firearms in every location.

2013); *Citizens for Police Accountability Political Comm. v. Browning*, 572 F.3d
1213, 1215 (11th Cir. 2009); *Schirmer v. Edwards*, 2 F.3d 117, 122–23 (5th Cir.
1993).

The same point holds for time, place, and manner restrictions after a forum
is deemed "public." Such restrictions pass muster if they are "justified without
reference to the content of the regulated speech," are "narrowly tailored to serve a
significant governmental interest," and "leave open ample alternative channels for
communication of the information." *Rock Against Racism*, 491 U.S. at 791. This
tailoring requires the regulation to promote a "substantial government interest that
would be achieved less effectively absent the regulation." *Id.* at 799.
Consequently, a regulation cannot "regulate expression in such a manner that a
substantial portion of the burden on speech does not serve to advance its goals."
*Id.* By extension, a regulation would be suspect if, as applied, a substantial
portion of its burden on protected rights does not advance its goals because the
alleged problem has not been proven to exist. To be sure, time, place, and
manner restrictions require narrow tailoring, not substantial relation. But the
principle is what matters—a regulation's validity is dubious where it is largely
futile because the facts do not implicate its asserted objective. *Cf. Golan v.
Holder*, 609 F.3d 1076, 1083 (10th Cir. 2010) (concluding, in First Amendment
context, that intermediate scrutiny bars content-neutral regulations from
"burden[ing] substantially more speech than necessary to further" government

16

interests).

The importance of the "where" in this case makes it necessary to address *Heller*'s laundry list of regulations of persons and "sensitive places" that are "presumptively lawful" and subject to permissible Second Amendment regulation. *Heller*, 554 U.S. at 626–27 & n.26.  In *Heller*, the Court explained that the holding did not "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  *Id.* at 626–27.  Although we are bound by this recent Supreme Court dicta, *see Surefoot LC v. Surefoot Corp.*, 531 F.3d 1236, 1243 (10th Cir. 2008), nothing about it ought to short-circuit our analysis of this regulation as applied to this parking lot.

As an initial matter, *Heller* spoke of "sensitive places," which could include some parking lots.  But most places are "sensitive" for someone.  Surely that, without more, cannot categorically justify a firearms regulation in all such places.  Such a conclusion would give the government untrammeled power to restrict Second Amendment rights in any place even plausibly considered "sensitive."  Our means/ends analysis requires more, particularly when we consider locations beyond schools and government buildings.  By explicitly listing those locations as examples of sensitive places, *Heller* placed a thumb on the scale in favor of considering them sensitive and thus presumptively regulable.

17

*See Heller*, 554 U.S. at 627 & n.27; *see also* Josh Blackman, *The Constitutionality of Social Cost*, 34 Harv. J.L. & Pub. Pol'y 951, 986 (2011) (indicating these enumerated locations are "presumptively sensitive"). That thumb on the scale can certainly be overcome depending on the qualities of the particular school or government building.[7] But in considering the parking lot, what matters is that no such thumb on the scale exists for those locations on which *Heller* expressed no view. Thus, to be treated as sensitive and consequently presumptively regulable, they must stand or fall on their own.

A few illustrations explain this point. The White House lawn, although not a building, is just as sensitive as the White House itself. Consequently, the

---

[7] This appears to be one point on which I part ways with the majority. Although the list and the facts of this case ultimately lead me to concur in the judgment regarding the post office building, I do not agree that the dicta necessarily means "the Second Amendment right to bear arms has not been been extended to 'government buildings.'" Maj. Op. at 3. That overreads *Heller*'s dicta. While the list could certainly mean the right does not extend to schools or government buildings, it could just as easily (perhaps more easily) mean the right extends to those locations but that regulations in those locations presumptively survive scrutiny at step two of our two-prong Second Amendment analysis. And the fact that the *Heller* Court provided its list of exceptions in the course of explaining that the Second Amendment right is subject to certain limitations, *see Heller*, 554 U.S. at 626, suggests it describes presumptively permissible limitations on the right, not cases where the right is not burdened at all. *See United States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010) ("[T]he phrase 'presumptively lawful regulatory measures' suggests the possibility that one or more of [the] 'longstanding' regulations 'could be unconstitutional in the face of an as-applied challenge.'") (quoting *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010)). To say the right has not been extended to government buildings is to imply no plaintiff could ever successfully challenge a restriction in any government buildings. That goes too far.

presumption of lawfulness for a regulation penalizing firearm possession there might approach the categorical. At the spectrum's other end we might find a public park associated with no particular sensitive government interests—or a post office parking lot surrounding a run-of-the-mill post office. Perhaps such locations are "sensitive" in the sense that the government always has an interest in protecting its property or visitors. But without more concrete evidence of particular vulnerability, any presumption of lawfulness for a firearms regulation cannot control. One who demonstrates a real burden on his Second Amendment rights in a location that is insufficiently sensitive to justify that burden has rebutted any presumption of lawfulness that could tip the scales against him under our two-prong test.

Thus, *Heller*'s dicta is consistent with this reality: the generally important government interest of public safety may be more or less critical on the particular facts of an as-applied challenge. And while generalization is permissible, it is less permissible if the government's interest is weaker in a particular subcategory of cases affected by the regulation. Those principles require invalidating the regulation as applied in the parking lot.

### 3. *Intermediate Scrutiny's Application to Our Facts*

I agree with the majority that public safety on government property is important, and no one disputes the government's interest in regulating its property in pursuit of that important goal. Thus, I agree that "[t]he government often has

more flexibility to regulate when it is acting as a proprietor," Maj. Op. at 10, to the degree this simply means that the government's asserted important interest in such cases may be weightier than when it "regulates private activity unconnected to a government service," *id.*[8]  Nevertheless, the baseline intermediate-scrutiny inquiry remains the same, including the requirement of "consisten[cy]."  *Reese*, 627 F.3d at 804.  And it is inconsistent to apply this regulation to the subcategory of covered individuals represented here.

First, what is the subcategory?  We deal here with lawful concealed carriers who wish to store their firearms in their car in a federal parking lot that poses no unique security or criminality concerns.[9]  That appropriately considers the particular circumstances of this case, while remaining focused on the class of cases (rather than the individual), as we must in an as-applied challenge.

---

[8]  I part ways with the majority to the extent it implies that the intermediate-scrutiny analysis is somehow looser or more forgiving simply because government-owned property is involved.

[9]  The category cannot simply be anyone carrying or storing a firearm on postal property, as the government hints.  After all, this is an as-applied challenge.  True, substantial relation to Bonidy himself is not required, and "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge."  *Doe v. City of Albuquerque*, 667 F.3d 1111, 1124 (10th Cir. 2012).  Nevertheless, the distinction does mean something.  We must examine substantial relation to some subcategory of the entire class of potential violators of a regulation.  Otherwise, we would transform this "as-applied" challenge into a facial challenge, because the government's preferred subcategory overlaps entirely with the universe of potential violators.

How can this regulation, as applied to Bonidy, be substantially related to the interest in preventing crime on postal property? Its "consistency" requires assuming that the mere act of carrying a permitted firearm increases the likelihood that one will engage in criminal activities on postal property or otherwise pose a danger. I see no support for such an assumption. And this parking lot's qualities confirm this regulation's poor fit. The Avon Post Office parking lot represents a subcategory of post office parking lots implicating no objectives beyond general public safety objectives. To be sure, some of the general justifications for applying this regulation (*e.g.*, valuables in the mail) apply here—but those justifications are true of all post offices.

If applying this criminality-focused regulation to the subcategory of lawful concealed carriers is dubious, it must be even more dubious to apply it to such a carrier in the subcategory of covered locations posing no particular risk of criminality. As the majority itself notes, the post office has not even found it necessary to "regularly employ any security officers." Maj. Op. at 3. The government implies that the location's specific characteristics are irrelevant. But as-applied challenges require analyzing the case's particular circumstances, and I cannot see how characteristics unique to this location are any less part of those circumstances than characteristics unique to Bonidy.

Our cases provide a simple limiting principle to my analysis: The government may restrict a class's Second Amendment rights when its

21

characteristics demonstrate a heightened risk of firearm misuse.  And because some prophylaxis is permissible, the government may regulate a class member who has not personally demonstrated a higher risk.

Thus, for example, we rejected the as-applied challenge in *Huitron-Guizar*, because every unlawfully present alien is a lawbreaker, which we held made it reasonable to treat them as posing an elevated risk of criminality.  Admittedly, Congress must generalize to conclude that "those who show a willingness to defy our law are candidates for further misfeasance or at least a group that ought not be armed when authorities seek them."  *Huitron-Guizar*, 678 F.3d at 1170.  But that generalization is at least moored to some quality beyond the mere fact of gun ownership that justifies the inference.  *Reese* fits easily into this framework, since anyone subject to a domestic-violence protective order has been determined at some point to pose a heightened risk of violence.

Conversely, because nothing about the Avon Post Office parking lot or Bonidy presents a unique security or criminality risk, the Postal Service can only validate its regulation by asserting that anyone carrying a gun poses a heightened risk of criminality.  That cannot be "substantially related" to a blanket prohibition on a fundamental right.  It is no answer to say that criminals could rob law-abiding carriers of their guns.  That is a possibility, but that is also true of people who possess firearms solely for home defense, and that did not save the regulation in *Heller*.  And I cannot see how a wholesale ban on the exercise of a

22

constitutional right for *everyone* is substantially related to preventing crime that *might* occur if criminals robbed some subset of those carriers.  The Supreme Court's instruction in a different context that we should not second guess a decision maker's choice "concerning the most appropriate method for promoting significant government interests," *Rock Against Racism*, 491 U.S. at 800, does not bar this analysis.  I would not second guess the choice; I would evaluate the choice's scope.  Thus, while I acknowledge that the building's security is related—perhaps even "integrally," as the majority posits—to the parking lot's security, that, without more, does not mean they must be treated identically.  It certainly does not mean that if banning Bonidy from carrying his firearm into the building is constitutional, banning him from storing his firearm in his truck in the parking lot must also be.

  I do not mean to discount the concept of permissible generalization.  By definition, substantial relation allows some generalization.  But when the threat to which generalization allegedly responds is vague and generalized (as the threat of criminality is here, as applied to parking lots posing no particular security risk), *less* generalization is permissible.  We would have a different case if we were dealing with the subcategory of postal parking lots where the government could have (and had) presented particularized information regarding security threats.  In such a case, that heightened need might make a prophylactic application of this regulation to a lawful concealed carrier "substantially related."

At any rate, the ease with which the government could alter this regulation to address its concerns while still respecting the Second Amendment rights of lawful carriers undercuts any substantial-relation argument. As the district court noted, rather than a flat ban on gun storage, the regulation could allow discretionary issuance of permits to "use the parking lot with the gun in a locked vehicle concealed in a glove compartment or console." App. 924. Such a policy would let the Postal Service control the carrying of firearms in locations where security concerns are indeed so pressing as to make a wholesale ban on firearms "substantially related" to those goals. Of course, a discretionary decision to deny the right on such a basis would be subject to an as-applied challenge. And the Postal Service might well prevail. But it would need to do what it has not done here—demonstrate facts about the location proving that a wholesale ban on temporary car storage of guns is substantially related to public safety.

The majority emphasizes this regulation's temporal and geographic limitation. Granted, that limitation makes this restriction less burdensome than one that restricts the right at all times and in all locations for a class of people. But, assuming Second Amendment rights extend outside the home, no one denies this regulation burdens them at least somewhat. That reality moves us to the second part of our two-prong test—the means-end analysis. Temporary or not, the regulation must still be substantially related to the objective. True, the fact that this regulation only burdens the right when citizens enter the limited area of

24

government concern evidences some tailoring.  But the foregoing discussion demonstrates its poor fit—one easily rectified—in other areas.  Solid tailoring in some respects cannot salve poor tailoring in others.

To be sure, much of this reasoning applies to some degree to the building itself.  But, as discussed, there is a key distinction between the building and the parking lot: *Heller*'s binding dicta.  There is a presumption that this government building is sensitive, which creates a presumption that the regulation within the post office is presumptively lawful.  This means, in theory, that arguments sufficient to invalidate a regulation in a non-building location might not suffice to invalidate the same regulation in a building otherwise similar in all material respects.  That question need not be decided here, since the government interests are not equally weighty when it comes to physically carrying a firearm into the building versus storing it in the car outside.

In fact, the differences are substantial.  The post office is an enclosed space, which requires patrons to interact in close quarters.  Thus, even a lawful use of the firearm for self defense within the building poses greater risks to innocent bystanders than it would in the parking lot.  And business involving valuables—a reasonable target for criminals—is transacted within the post office, not in the parking lot.  Finally, since the government's interest in public safety obviously encompasses avoiding accidents, there is a material difference between carrying a firearm on one's person into the area of heightened concern and storing

25

it in a less accessible location outside that key area.  In sum, given both this government building's presumptive sensitivity under *Heller* and the greater generalization permissible in light of the weightier government interests at stake, the regulation passes muster within the post office.[10]  This is not to foreclose the possibility that a subcategory of post offices exists in which this regulation would be impermissible.  It is only to say that, although a close call, this post office is not in that subcategory.

Finally, contrary to the majority's assertions, this framework would not require the Postal Service to provide a unique justification for every as-applied challenge to this regulation.  Although no two cases are identical, only some differences are relevant.  The relevant facts here are (1) that Bonidy is a member of the subcategory of covered individuals that are law-abiding legal firearms

---

[10]  Of course, every difference just noted also shows why the parking lot is insufficiently sensitive to qualify as presumptively regulable.  There are surely non-building locations that are sufficiently sensitive to make regulating firearms there presumptively lawful.  This parking lot is not one of them.  This explains why the majority's assertion that the sensitive-places language in *Heller* "applies with the same force to the parking lot as to the building itself," Maj. Op. at 8, is not quite on target.  To be sure, examining a location's similarity to the enumerated locations of schools and government buildings may aid in determining whether a particular location is "sensitive."  But that means courts should look to how similar the location in question is with respect to its sensitivity, not just its proximity or lack thereof to a government building.  For example, it would be odd if a government field otherwise low on the sensitivity scale could be transformed into a location where firearms could be forbidden with little justification by the erection of a public bathroom.  Proximity to a government building, without more, cannot be sufficient to exempt a location from the Second Amendment.

carriers, and (2) that the Avon Post Office parking lot is part of the subcategory

of covered parking lots posing no uniquely heightened security risk.  A decision

here would resolve any case with similar facts.  And under intermediate scrutiny,

a certain degree of prophylaxis remains permissible.  For the same reasons, any

suggestion that my view would require the Postal Service to "craft different rules

for each of its more than 31,000 post offices," Maj. Op. at 12, is misplaced.[11]

And, in the end, "the fact that a given law or procedure is efficient, convenient,

and useful in facilitating functions of government, standing alone, will not save it

if it is contrary to the Constitution, for [c]onvenience and efficiency are not the

primary objectives—or the hallmarks—of democratic government." *Free Enter.

Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 499 (2010)

(alteration in original) (internal quotation marks omitted).

## II.

Of course firearms restrictions on government property, in general, bear

some relation to the government's interest in preserving public safety on its

property.  But our cases require *substantial* relation.  The government presents

---

[11]  The majority observes that "[l]ocal and state laws do not trump federal laws," Maj. Op. at 13, in pointing out that Colorado's concealed-carry laws do not necessarily give Bonidy an untrammeled right to carry in the state.  This is, of course, true.  *See Heller*, 544 U.S. at 626 (noting the Second Amendment right is not a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose").  But that is not Bonidy's claim.  He claims not that state laws trump federal laws but that the Second Amendment trumps this federal law.

27

general information about postal property, which might bear on a facial challenge. Yet it offers no information bearing on the particular facts of this as-applied challenge. And while it undoubtedly matters that the government is acting as proprietor here, I believe the majority incorrectly treats that fact as more or less conclusive. Indeed, the tenor of the majority's analysis would seem to give the government free rein to restrict Second Amendment rights based on little more than showing that it owns the property at issue. At the very least, intermediate scrutiny demands more. And while the government's justifications might suffice to uphold this regulation on rational-basis review, *Heller* demands more. *See Heller*, 554 U.S. at 628 n.27.

Consequently, I would AFFIRM the district court's invalidation of this regulation as applied in the parking lot.

## Appendix

I find two pictures helpful in visualizing this case. First, I have attached an aerial view of the Avon Post Office and its parking lot, R., Vol. III at 765. Second, I have attached a picture of a post office in Tabernash, Colorado —another example of a rural post office with an unsecured parking lot.

28



Aerial View—Avon Post Office



Post Office—Tabernash